2021 UT App 19

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
GEORGE DARNSTAEDT,
Appellant.

Opinion
No. 20180922-CA
Filed February 19, 2021

Fourth District Court, Heber Department
The Honorable Jennifer A. Brown
No. 141500198

Emily Adams and Freyja Johnson, Attorneys
for Appellant

Sean D. Reyes and Jeffrey D. Mann, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which JUDGES
JILL M. POHLMAN and SENIOR JUDGE KATE APPLEBY concurred.[1]

HAGEN, Judge:

¶1 A jury convicted George Darnstaedt of twelve counts of sexual exploitation of a minor for knowingly possessing child pornography discovered during a search of his home computer. He appeals those convictions, contending they were based on insufficient evidence and that his trial counsel was constitutionally ineffective for making a generic

---

1. Senior Judge Kate Appleby began work on this case as an active member of the Utah Court of Appeals. She completed her work as a senior judge sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

directed verdict motion rather than pointing to specific deficiencies in the evidence. Darnstaedt also argues his counsel was ineffective for not ensuring that the jury was properly instructed on various elements of the offense and for not objecting to alleged prosecutorial misconduct during closing arguments. We reject those arguments and affirm Darnstaedt's convictions.

BACKGROUND

¶2 On June 17, 2013, a Utah law enforcement officer accessed Ares, a peer-to-peer file sharing network, to look for users illegally sharing child pornography. One particular IP address offered to share ninety-two files with hash values associated with known images of child exploitation. The officer downloaded one file and confirmed that it was indeed child pornography.

¶3 Through an administrative subpoena issued to the internet service provider, the officer identified the residence using the IP address at the time of the connection. Further investigation revealed that Darnstaedt lived at that address with his wife and two young daughters. Police also determined that the wireless networks at the house were locked so that no one outside the house could have gained access to the internet using that IP address without a password. Based on this information, police obtained a warrant to search Darnstaedt's house for evidence of child pornography.

¶4 Police executed the search warrant on July 11, 2013. When an officer explained to Darnstaedt that the search was part of an investigation into child pornography being distributed from the residence, Darnstaedt appeared shocked and repeated "the word 'distributed' with a little exclamation on the end, meaning like a question." During the search, the officers seized a desktop computer from a bedroom that had been converted into a home office space.

¶5     A forensic examination of the computer revealed fifty-five items that appeared to depict "underage individuals in fully nude, nude, or explicit-type pictures." The investigator noted it was unsurprising that the forensic team found fewer illicit files on the computer than the IP address had offered to share through the peer-to-peer network because some users "consume the pornography and then delete it immediately afterward" rather than "hoard[ing]" it.

¶6     The State ultimately charged Darnstaedt with twelve counts of sexual exploitation of a minor under Utah Code section 76-5b-201(1)(a). Each count was based on a specific file found on the computer's hard drive. The files contained graphic photographs and videos displaying the genitalia of prepubescent females and prepubescent females being raped and sodomized by adult males.

¶7     At trial, the State presented evidence explaining where each of the twelve files was found on the hard drive. Eight of the files were in the "recycle bin," indicating that a user purposefully downloaded then deleted them. A forensic examiner explained that when a user downloads a file, the data that makes up that file is saved on the hard drive and the operating system logs its location in a master file table. If a user later deletes the file, the file appears in the recycle bin. But the data is not erased from the hard drive, and the operating system still tracks where the data is stored. As a result, the file remains accessible to the user as "an active file," and the user can easily recover it from the recycle bin.

¶8     Three of the files were located in "unallocated space," indicating that they "had to have existed as . . . active file[s] at some point in time," after which a user had either deleted them and then removed them from the recycle bin or had used a shortcut key to bypass the recycle bin and permanently delete them directly to the unallocated space. To move a file to the unallocated space, a user would generally "drag and drop [the file] into the recycle bin and then go into the recycle bin and hit

'empty [recycle] bin.'" When the user empties the recycle bin, the file's data remains on the hard drive, but the operating system no longer tracks its location, and it allows that unallocated space to be used for storing new information. The old data remains in the unallocated space until it is overwritten. Until that happens, the data can be recovered with specialized forensic software. Although a file in unallocated space is "generally inaccessible" to the user, "[i]t was once an active file that the user was able to see" and "went through the process of deletion."

¶9      The last file of the twelve files that led to the charges was in the temporary internet cache of Darnstaedt's computer. A defense expert explained that temporary internet files are automatically saved to the computer's hard drive to speed up internet browsing when a user visits a website. While the "user simply sees the interface" of the web browser, the "computer's doing all the communication" from "behind the scenes." Although the temporary internet cache saves files automatically, they are "considered active files" accessible to the user, unlike files in unallocated space.

¶10     Temporary files in an internet cache as well as data in unallocated space can be erased using specialized software, such as CCleaner. Although legitimate users can use CCleaner "for general computer maintenance" and "to free up space" to improve computer performance, forensic examiners often see such data-erasing programs in child pornography cases.

¶11     Investigators found that CCleaner had been installed on Darnstaedt's computer, along with Ares, the peer-to-peer network used for downloading and sharing files. To download files from other computers on the Ares network, a user would have to deliberately search for files and choose to download them to a designated folder. They would not download directly to the recycle bin.

¶12     Investigators also recovered the registry of files on Darnstaedt's computer that were recently viewed or opened. The

list included "a considerable amount of files" that contained "key words that are consistent with files of child pornography." The case agent testified that people seeking child pornography use those key words—such as the acronym "PTHC" for "preteen hard core"—"as search terms when searching for files like this through the peer-to-peer network." For a file to appear on the registry list, a user would have to open the file after it was downloaded to the computer. Alongside the file names related to child pornography, the registry listed recently opened files such as "George's iPhone pics" and "George Darnstaedt vacation November 2011."

¶13    The State presented evidence that the computer was used almost exclusively by Darnstaedt. Darnsteadt's wife[2] testified that she "very rarely" used the computer and had entirely "stopped going into the [home] office" sometime before the police executed the search warrant. In contrast, Darnstaedt spent most of his time "in his office at his desk at the computer." During the two months before the search, including the time when the IP address associated with the house offered to share child pornography, Darnstaedt was unemployed and at home alone while his wife worked most of the day away from home and commuted nearly an hour each way. When his wife was home, Darnstaedt spent at least three to four hours a day at the computer on weekdays and even more time over the weekends.

¶14    Three user profiles had been created on the computer. Darnstaedt's wife testified that he originally set up a separate user profile for himself under his nickname "Jersey" and one for her under her nickname "Froggy," but that he regularly used her Froggy profile. The computer contained a third user profile named "Camie," which was associated with the file saved in the temporary internet cache, but there was no direct evidence

---

2. Darnsteadt and his wife were divorced by the time of trial; we continue to refer to her as "his wife" throughout this opinion for consistency's sake.

explaining why this profile had been created or who used it. No one named Camie lived in the household.[3]

¶15    Investigators found that someone had logged into the Froggy profile over 3,000 times and that it was the only profile on the computer connected to the Ares peer-to-peer file sharing network. The only occupants of the house were Darnstaedt, his wife, and their two young children, ages five and three years old. Darnstaedt's wife testified that she had never heard of Ares and had no idea how to use it. She further testified that she had never downloaded child pornography and had no "interest in seeing pictures or videos of children being raped."

¶16    Darnstaedt was the only other adult in the home. Although they did have an occasional housekeeper, teenage babysitter, or visiting family member or friend, the wife did not recall "anyone going into the office to use the computer" and testified that she never gave any of the passwords for the computer to any friends or visitors. She could not remember a time when any visitor would have had access to the computer or been alone for extended periods of time in the office.

¶17    The jury convicted Darnstaedt of all twelve counts of sexual exploitation of a minor. He now appeals.

ISSUES AND STANDARDS OF REVIEW

¶18    Darnstaedt first challenges the sufficiency of the evidence to support his convictions. When reviewing a preserved sufficiency of the evidence claim, we ask "simply whether the jury's verdict is reasonable in light of all of the evidence taken

---

3. Darnstaedt's wife testified she has a sister-in-law named Camie, but no evidence suggested that the sister-in-law or anyone else ever used the computer, much less set up a separate user profile under that name.

cumulatively, under a standard of review that yields deference to all reasonable inferences supporting the jury's verdict." *State v. Ashcraft*, 2015 UT 5, ¶ 24, 349 P.3d 664. On the other hand, when a sufficiency-of-the-evidence claim is not preserved but is raised under the ineffective assistance of counsel exception to preservation, it "presents a question of law, and to prevail on [such] ineffective assistance of counsel claims, [the defendant] must demonstrate that counsel's failure to raise the sufficiency issues to the trial court's attention was both objectively deficient and prejudicial." *State v. Heath*, 2019 UT App 186, ¶ 25, 453 P.3d 955 (cleaned up).

¶19 Darnstaedt further argues that his counsel was ineffective because he "(1) did not ensure that the jury was properly instructed on the meaning of possession and the correct mens rea and (2) did not object to the prosecutor's misstatement during rebuttal closing argument." Where, as here, "a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (cleaned up).[4]

---

4. Darnstaedt also argues that the cumulative effect of his counsel's errors deprived him of a fair trial. We will reverse under the cumulative error doctrine if "(1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the cumulative effect of all the potentially harmful errors undermines [our] confidence in the outcome." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038. On the other hand, if we determine "that either a party's claim did not amount to an error, or that the claim was an error but has no potential to cause harm on its own, the claim cannot weigh in favor of reversal under the cumulative effects test." *Id.* Because we ultimately conclude that counsel committed no errors that, on their own,

(continued…)

ANALYSIS

I. Sufficiency of the Evidence

¶20 Darnstaedt first argues the State produced insufficient evidence to show that he knowingly possessed child pornography. Specifically, he argues there was insufficient evidence that he knew about the files, "either because he downloaded them or otherwise knew they existed on the computer," or that he possessed the files, especially given that some of them were not accessible by an ordinary user at the time of the forensic examination. These arguments were not presented at trial.

¶21 Although Darnstaedt made a generic motion for a directed verdict, it was inadequate to preserve the sufficiency issues raised on appeal. To preserve an issue for appeal, a defendant must lodge "a timely and *specific* objection" in the district court. *State v. Rogers*, 2020 UT App 78, ¶ 47, 467 P.3d 880 (cleaned up). If a motion for a directed verdict "makes general assertions but fails to assert the specific argument raised on appeal, [it] is insufficient to preserve the more specific argument for appeal." *Id.* (cleaned up). "Such specificity is necessary to allow the district court to assess allegations by isolating relevant facts and considering them in the context of the specific legal doctrine placed at issue." *Id.* (cleaned up).

¶22 At trial, defense counsel stated, "I'd just move for a directed verdict based upon the evidence that's been presented. I don't see how a reasonable jury could find beyond a reasonable doubt that Mr. Darnstaedt was guilty. I'll submit." Darnstaedt contends that this was enough to preserve the challenges to the sufficiency of the evidence made on appeal because "the basis

---

(…continued)

would have had a conceivable potential for harm, there are no errors to accumulate.

for the directed verdict motion was clear in context," given that his counsel "did argue specifics in the preliminary hearing when he argued against bindover."

¶23 Although "a generic motion for directed verdict will preserve a specific ground for appeal when the specific ground for an objection is clear from its context," *State v. Isom*, 2015 UT App 160, ¶ 22, 354 P.3d 791 (cleaned up), Darnstaedt has not shown that this is such a case. At trial, Darnstaedt did not renew his preliminary hearing arguments and the district court's ruling did not refer to those arguments or otherwise suggest that the basis for the motion was apparent to the court. Because the issue raised on appeal was not "presented to the trial court in such a way that the trial court ha[d] an opportunity to rule on that issue," *see State v. Gallegos*, 2018 UT App 112, ¶ 14, 427 P.3d 578 (cleaned up), Darnstaedt's challenge to the sufficiency of the evidence was not preserved.

¶24 Darnstaedt nevertheless asks us to review this claim under the ineffective assistance of counsel exception to our general preservation rule. *See State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443 (recognizing ineffective assistance of counsel as one of "the three distinct exceptions to preservation"). "To prevail on an ineffective-assistance-of-counsel claim, a defendant must show both that counsel's performance was objectively deficient, and a reasonable probability exists that but for the deficient conduct defendant would have obtained a more favorable outcome at trial." *State v. Reid*, 2018 UT App 146, ¶ 19, 427 P.3d 1261 (cleaned up); *see also Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). Because a defendant must establish both, "we often skip the question of deficient performance when a defendant cannot show prejudice." *State v. Roberts*, 2019 UT App 9, ¶ 23, 438 P.3d 885; *see also Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

¶25    In this case, we do not consider the reasonableness of counsel's performance because Darnstaedt cannot establish prejudice. To demonstrate prejudice, "[a] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Darnstaedt cannot demonstrate a reasonable probability that a more specific directed verdict motion would have affected the outcome. Even if trial counsel had made the specific sufficiency arguments raised on appeal, it is not reasonably likely that the directed verdict motion would have been granted because "some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *See State v. Doyle*, 2018 UT App 239, ¶ 11, 437 P.3d 1266 (cleaned up).

¶26    As relevant here, Utah's child exploitation statute criminalizes knowing possession of child pornography.[5] *See* Utah Code Ann. § 76-5b-201(1)(a)(i) (Lexis Nexis Supp. 2020). In this case, Darnstaedt does not dispute that the twelve images on which the charges were based constituted child pornography. Instead, Darnstaedt argues that the State presented insufficient evidence to prove (1) that he possessed the images of child pornography and (2) that he did so knowingly. Although the evidence and arguments pertaining to possession and knowledge overlap, we attempt to address each element separately.

A.    Possession

¶27    A person who does not have actual physical possession of contraband at the time of arrest may still be convicted "if the

---

5. Although there are other variations of the crime, "[t]he State's theory at trial was that Darnstaedt knowingly possessed child pornography."

State can prove constructive possession." *State v. Workman*, 2005 UT 66, ¶ 31, 122 P.3d 639. To prove constructive possession, "the State must prove that there was a sufficient nexus between the accused and the contraband to permit an inference that the accused had both the power and the intent to exercise dominion and control over the contraband." *State v. Gallegos*, 2020 UT App 162, ¶ 19 (cleaned up), *petition for cert. filed*, Feb. 10, 2021 (No. 20210092). "Ownership or occupancy of the premises where contraband is discovered" may be insufficient, by itself, to prove constructive possession, but "[i]n cases where there is additional evidence, including circumstantial evidence, that strengthens the nexus between ownership or occupancy and the contraband, the jury may consider those circumstances in drawing an inference of possession." *State v. Ashcraft*, 2015 UT 5, ¶ 20, 349 P.3d 664.

¶28 "When only one person has access to a computer on which child pornography is located, demonstrating constructive possession is straightforward: it is clear that the sole person with access to the computer has at least constructive possession of the images." *State v. Jordan*, 2018 UT App 187, ¶ 35, 438 P.3d 862, *cert. granted*, 462 P.3d 797 (Utah 2020). But here the evidence showed that both adults living in the house had access to the computer and "joint occupancy alone cannot sustain an inference of constructive possession." *See id.* (cleaned up). Instead, the "defendant's joint occupancy of the premises where the contraband is discovered must be combined with other evidence sufficient to establish the defendant's knowing and intentional control over the contraband." *State v. Gilliard*, 2020 UT App 7, ¶ 30, 457 P.3d 1128 (cleaned up).

¶29 Where the defendant has non-exclusive ownership and control of the premises, the State must often rely on circumstantial evidence to prove the defendant's individual or joint possession of the contraband. But in this case, the joint occupant testified unequivocally that the child pornography found on the computer did not belong to her. Darnstaedt's wife, the only other adult living in the house, testified that she rarely used the computer and had never heard of the Ares peer-to-peer

file sharing software. She further testified that she had never downloaded child pornography, through Ares or otherwise, and had no interest in seeing such images. Darnstaedt's wife's testimony, if the jury believed it, disproved the alternative inference that the child pornography on the computer might have exclusively belonged to her as the joint occupant of the house.

¶30   But Darnstaedt argues the evidence was insufficient to disprove the possibility that a third, unknown person had access to the computer. He claims that "at least one person besides Darnstaedt and [his wife] used the computer: the person who set up the Camie account." And, he argues, "there was evidence that other people came into the house—including babysitters, a housekeeper, family members[,] and guests—who could have used the computer simply by walking into the accessible office and accessing the computer through a non-password-protected account."

¶31   Although it is appropriate to argue alternative inferences to the jury, such arguments would not merit a directed verdict. "The law is well established that the existence of one or more alternate reasonable hypotheses does not necessarily prevent the jury from concluding that a defendant is guilty beyond a reasonable doubt." *State v. Cardona-Gueton*, 2012 UT App 336, ¶ 11, 291 P.3d 847 (cleaned up). "It is the exclusive province of the jury to weigh the competing theories of the case, in light of the evidence presented and the reasonable inferences drawn therefrom, and to conclude which one they believe." *Id.* (cleaned up). Thus, "the existence of conflicting evidence alone cannot justify taking the case away from the jury." *State v. Torres*, 2018 UT App 113, ¶ 21, 427 P.3d 550.

¶32   The State presented ample evidence to support its theory that it was Darnstaedt, and not some unknown person, who not only possessed but actively acquired the child pornography. The evidence showed that a computer in his house was connected to the Ares peer-to-peer network and that a user offered to share

ninety-two files of suspected child pornography from that computer in June 2013. When the search was conducted less than one month later, investigators discovered fifty-five files containing explicit images of prepubescent girls. In addition, investigators found that files with names consistent with child pornography recently had been opened and were listed in the directory along with files labelled as belonging to Darnstaedt.

¶33    During this period, Darnstaedt had near exclusive control of the computer. Darnstaedt's wife testified that he was unemployed and home alone much of the time after he lost his job in May 2013. Darnstaedt spent long hours at the computer, even taking meals at his desk away from the family. Sometime before the search, his wife stopped using the computer or even going into the office. She also testified that although they had occasional visitors, she did not remember anyone ever using the computer nor could she think of a time when a visitor would have had the opportunity to do so for a prolonged period. Although Darnstaedt's wife was never directly asked whether the computer was password-protected, she implied as much when she denied ever giving "any of the passwords for the computer to any friends or visitors."

¶34    This evidence was more than sufficient to establish the required nexus between Darnstaedt and the images on the computer. The jury reasonably could reject the defense's theory that some unknown person had downloaded the images in favor of the more plausible inference that Darnstaedt had acquired the images himself during the long hours he spent alone at the computer during the relevant period. Unlike an occasional visitor to the house, Darnstaedt had the time and opportunity to install the Ares software, share files in June, and download the files found on his computer in July. Given that the State presented sufficient circumstantial evidence tying Darnstaedt to the child pornography, the theoretical possibility that someone else might have downloaded the images would not have justified taking the case from the jury. *See State v. Ashcraft*, 2015 UT 5, ¶ 29, 349 P.3d 664 ("The alleged connection to alternative

suspects was a fruitful source of cross-examination and argument to the jury. . . . Yet the jury was by no means compelled to accept the existence of reasonable doubt posited by the defense's finger-pointing, and in fact it did not accept the argument.").

¶35 Similarly, the existence of the Camie profile did not prove that someone other than Darnstaedt was using the computer. The wife testified that, on the rare occasions she used the computer, she used the Froggy account and never used any other username to log on to the computer. Darnstaedt and his wife were the only two adults in the house and, based on his wife's testimony, the jury could reasonably conclude that no visitor would have had reason or opportunity to set up a separate user profile.[6] Tellingly, Darnstaedt originally set up the Froggy profile for his wife, but regularly used that account himself. In fact, the Froggy profile was the one connected to Ares even though the wife testified she had never heard of the peer-to-peer network. The jury could reasonably conclude that Darnstaedt created and used the Camie profile, just as he did the Froggy profile, to avoid conducting illicit activities using his own profile.

¶36 The State also presented ample evidence that the person responsible for downloading the images had both the power and the intent to exercise dominion and control over them. For eleven of the twelve images, the State presented evidence that

---

6. Darnstaedt faults the State for not calling the sister-in-law named Camie to testify, but the State was not required to disprove every alternative inference so long as it presented sufficient evidence tying Darnstaedt to possession of the images. *See Ashcraft*, 2015 UT 5, ¶ 27 (explaining that, in assessing the sufficiency of the evidence to prove constructive possession, "it [is] unnecessary to eliminate other reasonable inferences to be drawn from the evidence" so long as "the inference adopted by the jury was sustainable").

someone did, in fact, exercise dominion and control over those files. The forensic investigator who examined Darnstaedt's computer testified that the eight files in the recycle bin could get there only by a computer user deleting them. The three files in unallocated space also had to arrive there through a process of deletion—either the user moved the files to the recycle bin and later emptied it or used a shortcut key to bypass the recycle bin. The jury could reasonably conclude that Darnstaedt was that user and that the affirmative steps he took to delete those eleven files proved he had dominion and control over them.

¶37 Despite this evidence, Darnstaedt argues there was insufficient evidence that he possessed the three images in unallocated space because such files "are not accessible to any user without forensic software, and no forensic software was found on the computer." In support of this claim, Darnstaedt relies on a case from the Virginia Court of Appeals in which the Commonwealth conceded that there was insufficient evidence that the defendant possessed images recovered from unallocated space. *Kobman v. Commonwealth*, 777 S.E.2d 565, 567 (Va. Ct. App. 2015). In that case, the court noted that "[w]hile the evidence may suggest appellant at one time possessed the photographs in the unallocated space, there was no evidence that he had dominion or control of them on or about" the date alleged in the indictment. *Id.* In contrast, Darnstaedt has not argued that the evidence in this case was insufficient to prove possession on the date alleged in the indictment. Rather, he argues that "the State did not put on evidence that Darnstaedt *ever* had dominion or control over the files." (Emphasis added.) This argument overlooks the direct evidence that a user exercised dominion and control over the files by deleting them and the circumstantial evidence from which a jury could reasonably infer that Darnstaedt was that user.

¶38 Darnstaedt also argues that there was insufficient evidence to prove constructive possession of the one file found in the temporary internet cache. The State presented evidence that files in the internet cache are active files that the user can

access. But, because the temporary file was associated with the Camie account, Darnstaedt argues there was no evidence that he possessed the file, because "it would have been pure speculation for the jury to infer that Darnstaedt had access to or control over the Camie account." To the contrary, for the reasons set forth above, the State produced sufficient evidence to support a reasonable inference that Darnstaedt created and controlled the Camie account.

¶39 In sum, the State presented sufficient evidence at trial to allow a reasonable jury to find that Darnstaedt possessed the images associated with each of the twelve counts. Even if the constructive possession arguments raised on appeal had been presented to the district court, it is not reasonably likely that the motion for a directed verdict would have been granted. Therefore, Darnstaedt cannot prove that he was prejudiced by his counsel's failure to make a more specific directed verdict motion challenging the element of possession.

B. Knowledge

¶40 The State also presented sufficient evidence from which a reasonable jury could find that Darnstaedt possessed the files knowingly. A person acts knowingly "with respect to his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or the existing circumstances." Utah Code Ann. § 76-2-103(2) (LexisNexis 2017). "Proof of a culpable mental state comes by way of circumstantial evidence, and proof of intent or knowledge is an inference that may be drawn by the factfinder both from direct and from circumstantial evidence." *State v. Mitchell*, 2013 UT App 289, ¶ 29, 318 P.3d 238 (cleaned up).

¶41 Here, the circumstantial evidence of knowledge was sufficient to submit the case to the jury. The jury reasonably could have found that Darnstaedt possessed each of the twelve images knowingly, as opposed to inadvertently, based on evidence that he sought out, downloaded, and viewed images of

child pornography and took steps to delete those images from his computer.

¶42 The evidence sufficiently dispelled any notion that Darnstaedt was an innocent user who unwittingly stumbled upon child pornography. Instead, the evidence showed that he actively sought out and downloaded child pornography, supporting the inference that he knew the illicit nature of the files saved on his computer. Based on the evidence of constructive possession outlined above, the jury reasonably could infer that Darnstaedt was the user who installed the Ares peer-to-peer file sharing network and that he did so for the purpose of obtaining child pornography. Although Ares can be used for other purposes, investigators testified that it is frequently associated with child pornography. And the IP address assigned to Darnstaedt's computer had offered to share ninety-two images of suspected child pornography on Ares, confirming that the network was being used for that purpose.

¶43 The evidence further showed that Darnstaedt knew that child pornography had been saved on his computer. At the time of the search, investigators found fifty-five sexually explicit images and videos of prepubescent children on Darnstaedt's computer. The directory showed that images with file names consistent with child pornography had recently been opened, along with files using Darnstaedt's name, further supporting the inference that he was knowingly viewing child pornography saved on his computer. Indeed, when officers executed the search warrant, Darnstaedt appeared surprised not at the mention of child pornography but at the suggestion that it was being distributed from his house. Based on this evidence, the jury could reasonably conclude that Darnstaedt was well aware that the files on his computer contained child pornography.

¶44 Darnstaedt points out that the twelve images he was charged with possessing were saved in inconspicuous locations—the recycle bin, unallocated space, and the temporary internet cache—where an innocent user would not be aware of

their existence. This argument does not account for the evidence that Darnstaedt was not an innocent user, but the person who actually acquired the images. With respect to the temporary internet file associated with the Camie account, Darnstaedt argues that "[t]here was no evidence that [he] knew about the Camie account, had control over the account or could view the temporary internet files for the account."[7] But, as we have

---

7. In Darnstaedt's reply brief, he argues for the first time that the State could not prove he acted knowingly with respect to the file saved in the temporary internet cache because there was no evidence that he knew of the computer's automatic-caching function. Utah courts have yet to address this issue, but the question of "whether a defendant can be convicted of possessing child pornography accessed from the internet and contemporaneously stored to the internet cache" has been the subject of considerable discussion in the federal courts. *See, e.g.,* *United States v. Romm*, 455 F.3d 990, 999 (9th Cir. 2006) (discussing federal circuit courts' attempts to address whether "knowing possession" applies to "images in the internet cache"). Like Utah's child exploitation statute, federal law does not punish unwitting or inadvertent possession or receipt of child pornography. *See United States v. Woods*, 684 F.3d 1045, 1060 (11th Cir. 2012) (noting that the scienter requirement "eliminates the possibility that an unwitting downloader of child pornography" would be convicted). As a result, federal courts "have reasoned that the mere presence of illicit materials in a computer's temporary internet cache, standing alone, is insufficient to establish knowing receipt, given that the files could have been saved there without the user's knowledge." *United States v. Myers*, 560 F. App'x 184, 186 (4th Cir. 2014) (collecting cases). In assessing whether there is sufficient evidence that the defendant knowingly received or possessed the illicit material, federal courts have looked at factors such as "the defendant's knowledge of the cache function, a search

(continued…)

already explained, the evidence supported a reasonable inference that it was Darnstaedt himself who created the Camie account and used it to seek out and acquire child pornography. With respect to the eleven files in the recycle bin and the unallocated space, the evidence established that a user actively deleted those files, either by moving them to the recycle bin or by emptying or bypassing the recycle bin. The evidence also showed that someone had installed CCleaner, which is designed to permanently erase both the unallocated space and the temporary internet cache. The jury reasonably could infer that Darnstaedt was the only person who would have taken such

---

(…continued)

pattern for child pornography, evidence of deleting illicit files after the fact, or the use of cache cleaning software." *United States v. Winkler*, 639 F.3d 692, 698 (5th Cir. 2011) (collecting cases). But the courts are split as to what evidence is sufficient to prove knowledge. *Compare United States v. Dobbs*, 629 F.3d 1199, 1204-05 (10th Cir. 2011) (holding that proof that the defendant "knowingly and methodically sought out child pornography" was insufficient to show knowing possession of cached files where there was no evidence that the defendant "at least knew of the automatic-caching process"), *with United States v. Fall*, 955 F.3d 363, 376 (4th Cir. 2020) (noting that "many of our sister circuits have affirmed child pornography convictions based on circumstantial evidence of the defendant's history and involvement with child pornography"). Although our jurisprudence could benefit from case law on this issue, we hesitate to weigh in on a matter of first impression in Utah without the benefit of full briefing. Therefore, we adhere to the general rule that "issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." *Brown v. Glover*, 2000 UT 89, ¶ 23, 16 P.3d 540.

actions, supporting an inference that he knew those files were saved on the computer.

¶45 In short, "this is not the exceptional case in which the government has persisted in bringing a criminal prosecution against the unknowing victim of a computer's inner workings." *See United States v. Winkler*, 639 F.3d 692, 699 (5th Cir. 2011). Instead, the evidence showed that Darnstaedt was a sophisticated user who purposefully sought out child pornography using a peer-to-peer file sharing network, had a pattern of downloading and deleting child pornography, had recently opened files whose file names strongly suggest child pornography, and had installed a data erasing program capable of erasing the temporary internet cache. Because the State presented sufficient circumstantial evidence to prove knowledge, there is no reasonable likelihood that a more specific directed verdict motion would have succeeded. Therefore, Darnstaedt has not established that he received ineffective assistance of counsel in connection with the directed verdict motion.

## II. Other Ineffective Assistance of Counsel Claims

¶46 Next, Darnstaedt argues his counsel was ineffective because he "(1) did not ensure that the jury was properly instructed on the meaning of possession and the correct mens rea and (2) did not object to the prosecutor's misstatement during rebuttal closing argument." To assess whether a defendant's constitutional right to the effective assistance of counsel has been violated, "we apply the two-part test articulated in *Strickland v. Washington*." *State v. Florez*, 2020 UT App 76, ¶ 40, 465 P.3d 307. Darnstaedt "must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense." *See State v. Beckering*, 2015 UT App 53, ¶ 21, 346 P.3d 672 (cleaned up). Counsel's performance was deficient if "it fell below an objective standard of reasonableness." *Id.* (cleaned up). In this section, we address only the deficient performance element because "a failure to

prove either element defeats the claim." *State v. Hart*, 2020 UT App 25, ¶ 19, 460 P.3d 604 (cleaned up).

A.    Jury Instructions

¶47    Darnstaedt first argues that his trial counsel did not ensure that the jury was properly instructed on the elements of the offense. Specifically, he argues that "the jury was not instructed on (1) the meaning of the criminal act, which was to 'possess' child pornography or (2) the proper mens rea for distributing and viewing."

¶48    The jury was instructed that it could convict Darnstaedt of sexual exploitation of a minor only if it found that each of the following elements had been proved beyond a reasonable doubt:

1.    That the defendant;

2.    In Wasatch County, State of Utah;

3.    On or about July 11, 2013;

4.    Did knowingly;

5.    Produce, possess, possess with intent to distribute, or view;

6.    Child pornography.

Although element five included each of the statutory variants, the parties agree that the State proceeded under a possession theory at trial. Consistent with that understanding, the court instructed the jury that "the State must prove that the defendant was *in possession* of a different item of child pornography for each of the charges listed above, and that the other elements are met as to each item of child pornography." (Emphasis added.) With that context in mind, we turn to Darnstaedt's specific challenges.

¶49   First, Darnstaedt argues that his "counsel performed deficiently when he did not ensure that the jury was instructed properly on constructive possession." Darnstaedt does not argue that the instructions affirmatively misstated the law, but instead argues that they were insufficient because they did not define the term "possession" or otherwise "inform the jury on what the state must prove to demonstrate possession of electronic files on a shared computer." Darnstaedt suggests that his attorney could have remedied this deficiency by requesting the jury be instructed using the model Utah jury instruction defining constructive possession in the context of drug cases. *See* Model Utah Jury Instructions 2d CR1202B (2018), http://www.utcourts.gov/resources/muji [https://perma.cc/F4EW -3UHP].

¶50   Given the evidence at trial, Darnstaedt's counsel acted reasonably in not proposing such an instruction. In determining whether counsel's performance was constitutionally deficient, "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable." *State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350. Nonetheless, "if the court concludes that the challenged action might be considered sound trial strategy, it follows that counsel did not perform deficiently." *Id.* (cleaned up).

¶51   Here, we can easily conceive of a sound strategic reason for not requesting the model instruction on constructive possession. This was not a joint occupancy case in which there was no evidence as to which occupant might have possessed the child pornography found on a shared computer. Darnstaedt's wife was the only other adult resident of the house and the only person known to use the computer besides Darnstaedt. She testified that the child pornography on the computer did not belong to her. She also testified that she could not remember any visitors using the computer or having access to the office for any significant period. In contrast, Darnstaedt exercised nearly

exclusive control over the computer and spent long hours alone in his office during the relevant time frame.

¶52    In light of this evidence, trial counsel could reasonably have decided to leave "possession" undefined rather than request a jury instruction that was largely favorable to the prosecution. The model instruction on constructive possession would have directed the jury to consider factors such as the defendant's ownership and occupancy of the place where the contraband was found, whether the defendant's ownership or occupancy was exclusive, whether contraband was in a location where the defendant had "special control," and whether other people also had access to it. *See* Model Utah Jury Instructions 2d CR1202B (2018) [https://perma.cc/F4EW-3UHP]. A reasonable attorney could conclude it was not in Darnstaedt's best interest to include a constructive possession instruction highlighting those factors, which weighed heavily in favor of finding that he possessed the images. Such decisions are matters of trial judgment and strategy and do not rise to the level of deficient performance.

¶53    Second, Darnstaedt argues his counsel was ineffective because he did not object to "a misstatement of the law in the jury instruction" that "listed the mens rea for distributing and viewing [child pornography] as *knowingly*" when "the mens rea for distributing and viewing is *intentionally*." The State concedes that "the statute imposes an intentional mental state for 'distributing and viewing child pornography,'" but argues that trial counsel did not perform deficiently in overlooking this error because the variants of distributing or viewing child pornography were not at issue in this case. We agree.

¶54    The jury instructions correctly stated the knowing mental state for possession, the only theory the State pursued at trial. The instructional error was including the variants of "distributing" and "viewing" without specifying that those variants require an intentional mental state. But "not objecting to an error does not automatically render counsel's performance

deficient." *State v. Ray*, 2020 UT 12, ¶ 31, 469 P.3d 871; *see also Scott*, 2020 UT 13, ¶ 39 ("Reasonably effective assistance does not require counsel to correct every error that might occur during a trial."). "We must view a decision to not object in context and determine whether correcting the error was sufficiently important under the circumstances that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." *Ray*, 2020 UT 12, ¶ 32.

¶55    Here, counsel's failure to object to the error in the elements instruction did not fall below an objective standard of reasonableness. The focus at trial was on whether Darnstaedt knowingly possessed the images. A reasonable attorney could have overlooked the error because it related to variants that did not appear to be at issue. Under the circumstances, correcting the erroneous instruction was not "sufficiently important that counsel's inaction was objectively unreasonable." *See id.* ¶ 44. Therefore, Darnstaedt has not established that his counsel's performance was deficient.

B.    Closing Argument

¶56    Finally, Darnsteadt argues that his counsel was ineffective because he failed to object to the prosecutor's rebuttal argument suggesting that access to the computer was protected by a password. Because prosecutorial misconduct is not a "standalone basis for independent judicial review[,] . . . absent an objection at trial, we review the district court's actions under established exceptions to the law of preservation." *State v. Hummel*, 2017 UT 19, ¶ 111, 393 P.3d 314. In this case, Darnstaedt asks us to review this issue through the lens of ineffective assistance of counsel.

¶57    At trial, the State presented no direct evidence that the computer was password-protected. The only evidence regarding computer passwords consisted of the following testimony from Darnstaedt's wife:

Q: Did you personally ever give any of the passwords for the computer to any friends or visitors?

A: No.

¶58   During his rebuttal to closing argument, the prosecutor assumed that the computer was password-protected and suggested that the jury had heard testimony to that effect. Specifically, the prosecutor argued as follows:

> [Someone] would have to have gotten passwords for the computer. We heard information about how the computer was password protected and . . . information that [the wife] never gave those passwords to anyone. She only knew the password—that we know that she knew the password for one account, but she can't even remember which account it was that she knew it.

> So someone with access to the password for the Froggy account had to—so they had to have the password. . . .

> And that's just not even—not even within the realm of reasonable to believe that a babysitter without a password did that, that somebody who was doing yard work should be someone that we can't rule out, that someone who cleaned the house occasionally without a password would be able to do.

Defense counsel did not object to these statements.

¶59   Darnstaedt argues that the prosecutor misstated the evidence and that competent trial counsel should have objected. Given the lack of direct evidence that the computer was

password-protected, such an objection might have been well-taken. On the other hand, counsel for both sides "have considerable latitude in the points they may raise," *Hummel*, 2017 UT 19, ¶ 110 (cleaned up), including "the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports," *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (cleaned up). Trial counsel reasonably might have concluded that the wife's testimony that she had not provided the passwords to anyone adequately supported the prosecutor's inference that a password protected the computer.

¶60 In any event, the prosecutor's argument was not so egregious that trial counsel's only reasonable course of action was to object. "When we review an attorney's failure to object to a prosecutor's statements during closing argument, the question is not whether the prosecutor's comments were proper, but whether they were so improper that counsel's only defensible choice was to interrupt those comments with an objection." *State v. Bermejo*, 2020 UT App 142, ¶ 88, 476 P.3d 148 (cleaned up), *petition for cert. filed*, Dec. 22, 2020 (No. 20200933). "And the law recognizes the prerogative of opposing counsel to swallow their tongue instead of making an objection that might have the risk of highlighting problematic evidence or even just annoying the jury." *Hummel*, 2017 UT 19, ¶ 110.

¶61 Darnstaedt's counsel reasonably could have concluded that there was nothing to be gained from objecting to the prosecutor's argument. During closing arguments, a district court is rarely in a position to resolve disputes about whether a particular argument is supported by evidence in the record. Lacking a transcript of the testimony or briefing on whether a particular fact reasonably can be inferred from the evidence presented, district courts almost invariably respond to such objections by instructing the jury that the arguments of counsel are not evidence and that the jury's recollection of the evidence controls. Here, the court had already advised the jury, "If the lawyers say anything about the evidence that conflicts with what you remember, you are to rely on your memory of the

evidence." Trial counsel reasonably could conclude that an objection merely would have prompted the court to reiterate that instruction, to no real effect. Under these circumstances, the failure to object did not rise to the level of deficient performance.

CONCLUSION

¶62    Darnstaedt has not established that he received ineffective assistance of counsel. He cannot establish prejudice in connection with the motion for a directed verdict, because a more specific motion would not have succeeded in light of the evidence supporting each element of the offense as to all twelve charges. With respect to his remaining claims, he cannot establish deficient performance because it was not objectively unreasonable for trial counsel to forgo objections to either the jury instructions or the prosecutor's closing argument. Accordingly, we affirm Darnstaedt's convictions.

_____